HAWLEY & LETZERICH ET AL. *v.* UNITED STATES (No. 3386)[1]

[1] T. D. 44893.

United States Court of Customs and Patent Appeals, April 27, 1931

*Walden & Webster* (*Walter F. Welch* and *Edward F. Jordan* of counsel) for appellants.

*Charles D. Lawrence*, Assistant Attorney General (*John F. Kavanagh* and *Ralph Folks*, special attorneys, of counsel), for the United States.

[Oral argument April 1, 1931, by Mr. Jordan and Mr. Folks]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

GARRETT, Judge, delivered the opinion of the court:[1]

This is an appeal from a judgment of the United States Customs Court overruling a large number of protests by appellants against the collector's classification and assessment for duty, under the Tariff Act of 1922, of various importations of rags.

Most of the importations seem to have been from Japan. Others were from Europe. The entries were at the ports of Galveston, Tex., and Philadelphia, Pa., respectively. In some instances classification by the collector was as "waste not specially provided for" under paragraph 1457 of said tariff act, duty being assessed at 10 per centum ad valorem. The other importations were classified under paragraph 1459 as "nonenumerated manufactured articles," and duty assessed at 20 per centum ad valorem.

The importers in their protests made several claims, the following being typical:

\* \* \* that said merchandise is free of duty under paragraph 1651, or 1601, or paragraph 1560, or is dutiable as cotton waste, advanced, at 5 per centum ad valorem under paragraph 901, or at the appropriate rate according to the component material of chief value, provided such rate is not greater than the rate

---

[1] Rehearing denied,

assessed, or at 10 per centum or 20 per centum ad valorem under paragraph 1459.

The Customs Court held that appellants had failed to sustain the burden of proof necessary to overcome the presumption of correctness attaching to the collector's classifications and overruled the protests, affirming such classifications as were made under paragraph 1459 but without affirming those made under paragraph 1457, the case of *United States* v. *Anderson*, 17 C. C. P. A. (Customs) 393, T. D. 43833, being cited.

Upon the appeal to this court appellants abandoned their claims as to the applicability of any provisions of the act, except paragraph 1601, providing for "junk, old," or paragraph 1651, which reads as follows:

PAR. 1651. Rag pulp; paper stock, crude, of every description, including all grasses, fibers, rags, waste, including jute, hemp, and flax waste, shavings, clippings, old paper, rope ends, waste rope, and waste bagging, and all other waste not specially provided for, including old gunny cloth, and old gunny bags, used chiefly for paper making, and no longer suitable for bags.

We do not regard paragraph 1601 as being applicable under the record presented, and same will not be further considered.

In the *Anderson* case, *supra*, cited by the Customs Court, the issue under the record as made up lay between paragraphs 901 and 1457 of the Tariff Act of 1922. In another case referred to in the briefs and in oral argument, *Pacific Iron & Metal Co. et al.* v. *United States*, 15 Ct. Cust. Appls. 433, T. D. 42605, the issue seems to have been, under the evidence presented, between paragraphs 1457, 1459, 1560, 1601, and 1651, respectively.

In both the foregoing cases the merchandise involved consisted of rags, and their classification was determined by the evidence as to their use presented in the respective cases.

We think it obvious that the phrase "used chiefly for paper making," appearing in paragraph 1651, *supra*, relates only to old gunny bags no longer suitable for bags. At any rate, the phrase does not relate back to "paper stock," the second item therein mentioned, and therefore the rule as recently stated by us in *Wilbur-Ellis Co. et al.* v. *United States*, 18 C. C. P. A. (Customs) 472, T. D. 44762, is here applicable:

* * * if there be an *eo nomine* designation, the common meaning thereof must be determined as of the date of the enactment of the tariff act, * * *.

The particular language of paragraph 1651 under which importers claim the merchandise to be admissible free of duty is:

* * *; paper stock, crude, of every description, including all * * *, rags, * * *.

Accordingly, appellants' proof has been presented in an effort to establish the fact that the imported merchandise is what was commonly and commercially known and used as paper stock at the time of the passage of the Tariff Act of September 21, 1922. The Government's effort has been to convince the court that it is not shown to be of the type or class then so known and used.

It is proper to say that there is no question of commercial designation as distinguished from common meaning here raised, and the issue is one to be determined as a fact under the proofs presented, in the light of the rule of law above stated, bearing in mind, of course, the general rule that the classification of the collector is presumed to be correct and that the burden of overcoming this presumption rests upon the importer.

The Customs Court says:

Upon careful consideration of the entire record, we find the weight of the evidence establishes that rags of the type involved in these importations are bought, sold, and commercially known to the trade as "wipers" and are chiefly used for wiping machinery and similar purposes. An inspection of the samples discloses that the rags are in large pieces and ready for use as wipers.

This court is extremely reluctant to reverse the trial court upon a finding of fact and consistently observes the rule that it will do so, in protest cases, only where such finding is against the weight of the evidence.

It is the contention of appellants, however, that the trial court's finding was not a finding that the merchandise in issue was not known as paper stock *at the time of and prior to the passage of the Tariff Act of 1922*, and it is specifically assigned as error that the court failed to find affirmatively that it was so known and used.

The opinion has been searched with care, and the nearest approach to a specific finding upon this point, other than as above quoted, appears in the following language:

The importers contend that in arriving at the intent of Congress the trade name and chief use of this type of rag at and prior to the passage of the Tariff Act of 1922 should prevail over the trade name and chief use at the time of importation. However, the conflicting evidence in the record does not warrant a conclusion that this class of rags was ever used or commercially known as paper stock.

Appellants deny that there is any conflicting evidence as to the use at the time of and prior to the passage of the act of the merchandise at issue and insist that the only direct and positive testimony of use at such time is that presented by the witnesses for appellants. They contend that the testimony of the witnesses called on behalf of the Government does not relate to the imported goods but to goods claimed by the Government, but not proven, to be similar, and that the testimony of those witnesses relating to the use of the goods, con-

cerning which they did testify, was not specific to the time of, and prior to, the passage of the tariff act but to a later period.

These contentions have necessitated a careful examination by us of the testimony in the record.

Two witnesses were called by the importers—Messrs. John McBlaine and Frederick H. Lunning.

Mr. McBlaine appears to be a member of the firm of McBlaine & Co., dealers in "new and old cotton rags" and "cotton-mill waste," on whose behalf the importations at issue were made. He states that he has been dealing in these commodities since 1902, at wholesale, "all over the United States."

Numerous samples, contained in 18 bundles, were identified by this witness as being the official samples taken from the shipments entered at the ports of Philadelphia and Galveston. These were filed as exhibits and made a part of the record. The witness testified that the goods contained in the shipments from which official samples were not produced were of the same character as the goods represented by the exhibits filed and states that most of the samples consisted of "old underwear * * * worn out and discarded"; that the merchandise was "all old rags" and no longer fit for underwear.

His testimony then ran as follows:

Q. Are they fit for any other use than remanufacture as old discarded garments?—A. Fit for paper making.

Q. Are they fit for anything but remanufacture?—A. They are.

Q. What are they fit for other than remanufacture?—A. They are useful as paper-making material.

Q. Now, Mr. McBlaine, were you dealing in merchandise of this character at wholesale at and prior to September 21, 1922?—A. We were.

Q. How extensive were your sales throughout the country?—A. Why, all over the United States.

Q. Was such merchandise then known by a definite, uniform, and general name?—A. Underwear rags have been known as underwear rags, and white rags are known as white rags.

Q. In the course of your business and your personal experience did you have occasion to learn prior to September 21, 1922, what was the chief use of such merchandise?—A. Yes, sir.

Q. Please state.—A. Paper making.

Q. Were these goods as a class ever known or bought and sold in the wholesale trade as paper stock?—A. That is what they were called—paper stock.

Q. Was that uniform, definite, and general?—A. That is the general trade term.

The witness, Lunning, testified that he had been a wholesale dealer in "general line of waste" for 18 years, "west to St. Louis," and that during all that time he had dealt "in old rags similar to the various exhibits here in this case," they being the particular exhibits theretofore identified and filed by McBlaine. At another point he stated that his business was dealer in "waste and paper stock." He stated

that "paper makers' supplies" meant rags and also pulp, and that he dealt in rags. We quote the following from his testimony:

Q. Now referring to the exhibits in this case which you just inspected and said you dealt in at wholesale, will you please state whether or not at and prior to September 21, 1922, they were known uniformly, definitely, and generally in the wholesale trade of the United States as paper stock?—A. They were.

Q. Was that their use at that time?—A. It was.

The witness stated on cross-examination that prior to September 22, 1922, it was not customary in the trade that rags sold to paper makers should be "bleached, trimmed, and washed," but added:

* * * they [the purchasers of paper stock] specify according to the price paid; sometimes the ordinary term rags, sometimes they talk about them as clean.

*      *      *      *      *      *      *

Q. When you bought rags to be later turned over to the paper makers, did you insist that the rags be washed before you bought them?—A. Not unless it was so specified.

Q. Was it ever specified that they should be?—A. Yes.

Q. How often?—A. No specific time or day, but if I wanted them that way I would get them that way.

The Government introduced the testimony of five witnesses, the first of whom was Mr. Walker Q. Wenrich, a Government examiner of merchandise at the port of Philadelphia.

This witness produced three bundles of samples which he stated were delivered to him at his request by Mr. McBlaine, "representing as he told me, the merchandise." These bundles were placed in evidence as Exhibits "2a, b, and c, 216054–G." No. 216054–G appears to be a protest as to certain of the Hawley & Letzerich importations at Galveston. An examination of the samples thus filed shows them to be washed rags of irregular sizes, most of them pieces of old underwear. The witness also produced two other bundles of samples which were filed as Exhibits 3 and 4, 216054–G, respectively. These latter are not stated to have been supplied by McBlaine, nor is there any disclosure of the source or sources from which they were obtained. The witness stated as to Exhibit 3, "this sample was taken intact from a bale imported." It is not stated by whom it was imported, nor when, nor where. The rags in the bundle are thin, white, cotton rags that have been washed, some of them as much as 3 feet in length by 18 inches in width, some about 12 inches square and others smaller. Exhibit 4 comprises a bundle of colored rags of irregular sizes. There is nothing whatsoever to show that it is a sample taken from the goods involved, and Government counsel stated that it was introduced "to show the court the difference in the packing and size." Why Exhibits 3 and 4 were marked to relate to 216054–G we do not understand.

Obviously, these samples are not sufficiently identified by the testimony with the importations as to render it proper to consider

them a part of the merchandise here involved. Even if they were, or if they be treated as illustrative exhibits, the witness, Wenrich, was not asked any questions as to their uses. He was asked several questions about "wipers," "Japanese wiping rags," "inspection," "packing," etc., and testified, in a general way, about these matters, but none of his testimony was directed to the large number of official samples filed and identified by McBlaine, nor even to the samples which the witness himself filed.

Other witnesses called by the Government were Messrs. O'Neill, Lachman, Doyle, and Leipheimer.

O'Neill stated that he was engaged in the "general waste business," and bought and sold wiping rags; that they were "bought as Japanese wipers and sold as wiping rags"; had been buying and selling them "for about 10 years," to "railroads, iron and steel plants, and other industrial establishments where wipers are used"; that the smallest size of such rags is supposed to be about 144 square inches, and that the prices varied.

Q. The darker the color the cheaper the price?—A. Exactly.

The witness stated that the samples in Exhibit 3 were known as "Japanese No. 1 muslin wipers * * * worth about 7 to 8 cents per pound," and that those of Exhibit 4 would be taken by him as "a good delivery for Japanese colored wipers," and that they were worth "around 6 cents" per pound.

He was asked no questions and gave no testimony whatever about the official samples.

The testimony of the other three Government witnesses, who were or had been rag dealers, is, in a general way, corroborative of that of O'Neill, but their testimony upon the merchandise was, like O'Neill's, practically confined to the exhibits filed by Wenrich. The only exception to this is that in Doyle's testimony there appears the following question and answer:

Q. Now, again, look at this miscellaneous collection of "what have you" here and tell the court what you consider them to be.—A. [Referring to the Exhibit in 271421–G] This is a washed Continental, European, white wiper.

The bundle (271421–G) we have examined along with all the other exhibits in the case. It is made up of a lot of thin cotton rags of different and irregular sizes, some of them as much as 18 incles long by 4 inches wide and others varying from these dimensions.

The witness was asked no question as to their specific use and gave no information relating to that.

No one of the Government's witnesses was asked about, or testified concerning, the use of the merchandise represented by the official samples at the time of and prior to the passage of the Tariff Act of September 21, 1922.

It is urged in the Government's brief that the testimony of the Government witnesses was permitted without objection on the part of importers' counsel, and that the importers are, therefore, bound by it. We know of no reason why, upon the importers' theory of the case, their counsel should have felt called upon to make objection, unless he had chosen to do so on the ground of irrelevancy and immateriality in order to shorten the record. The testimony was not injuring his case. The Government witnesses were not being examined upon the official samples, but upon samples which were not satisfactorily shown to be identified with the importations. These witnesses were not at any time asked nor did they at any time give any testimony as to what the imported merchandise was used for in and prior to September, 1922. The official samples were there as a part of the record. The testimony in behalf of the importers had been positive and unequivocal as to their being known as paper stock used for paper making at the time of and prior to the passage of the tariff act. Certainly the importers' case should not be decided upon testimony relating to other merchandise whose use even was not shown at the time of the passage of the law.

It may be accepted as correct that the invoices show the merchandise as "Japanese wiping rags," "Jap wipers," or the like, but, as Government counsel concedes, the name under which the merchandise may be entered is not controlling as to its classification. That is so well settled in customs law as to require no citation of authority.

Emphasis has been placed by the Government upon the fact that the samples of the exhibits show the rags to have been washed and the buttons removed, and it is insisted that paper-stock rags are not imported in this condition but only in an unclean state; that they are not "crude" rags, because they have been washed, sorted, fumigated, sized, and had the buttons, clasps, etc., removed.

As for the sizing, that is answered by an inspection of the official samples. The dimensions are so various and different as to negative the contention that they have been sized. As to the other processes, we know of no adjudication by any court holding that these destroy the crudeness of the rags or that putting them in a sanitary condition by fumigation and washing or that removing hooks and buttons destroys their usefulness for paper stock.

The following from our decision in the *Pacific Iron & Metal Co.* case, *supra*, is apropos:

In the case of *United States* v. *Stone & Downer*, 12 Ct. Cust. Appls. 293, T. D. 40296, on authority of cases there cited, we said: "As a general rule, a mere cleansing process the purpose of which is to isolate the article of commerce from impurities, and which does not advance it beyond a clean state or condition, and which does not affect the article *per se*, can not be said to be   *   *   *" a manu-

facturing process in a tariff sense. Likewise, the removal of buttons, hooks, and other foreign matter from a material for the sole purpose of getting the material by itself would not be a manufacturing process. *United States* v. *Michelin Tire Co.*, 1 Ct. Cust. Appls. 518, T. D. 31544.

The testimony of the witness, Lunning, quoted *supra*, is quite positive in the declaration that it was sometimes specified by purchasers of paper-stock rags that they should be washed before being bought by them. There is no contradiction of this by any witness for the Government except by implication. The court seems to be asked merely to infer that such is the case and was at and prior to September 21, 1922.

Our examination of the record and analysis of the testimony convince us that the trial court must have overlooked two salient omissions in the testimony in behalf of the Government.

First, there is no adequate testimony connecting the samples about which the Government witnesses testified with the goods actually imported.

Second, the testimony of these witnesses, even as to the exhibits of which they did speak, nowhere attempts to show the use to which the goods were put at the time of and prior to the passage of the Tariff Act of 1922.

The only testimony upon these two pivotal questions is that in behalf of the importers, and this, being clear, positive and unambiguous, must be held sufficient, being entirely uncontradicted, to overcome the presumption of correctness attaching to the collector's classification.

We have had occasion frequently to say, in substance, that the presumption of correctness of the collector's classification is rebutted by competent, credible testimony; that his classification is not evidential, and that, when *prima facie* rebutted, the Government, in order to prevail, must present competent, credible testimony to sustain it. *United States* v. *Wanamaker*, 14 Ct. Cust. Appls. 285, T. D. 41888; *Morse Bros. (Inc.)* v. *United States*, 13 Ct. Cust. Appls. 553, T. D. 41432; *United States* v. *Marshall Field & Co.*, 18 C. C. P. A. (Customs) 469, T. D. 44761.

Under the record in this case the protest of the importers should have been sustained and the merchandise classified under paragraph 1651 as claimed by them.

Accordingly, the judgment of the Customs Court is *reversed* and the cause *remanded* for further proceedings in accordance herewith.

BLAND, J., dissents.