UNITED STATES v. MICHELIN TIRE Co. (No. 204).[1]

1. INDIA RUBBER RECOVERED FROM SCRAP OR REFUSE.
    Chopping old scrap or crude rubber, separating therefrom particles of iron, such as rivets, valves, etc., grinding the rubber into smaller particles, chemically treating, washing, riffling, and blowing these, are all done to separate the rubber from the other component materials of the scrap or refuse—in short, to recover or reclaim the rubber in a shape suitable for transportation and marketing; and it has not thus been manufactured, in whole or in part, becoming a particular manufactured article; it has rather been made fit as a single material to be manufactured anew.

2. SAME—UNDER PARAGRAPH 579, TARIFF ACT OF 1897.
    Paragraph 579, tariff act of 1897, to be given its due and proper effect, must be taken to have placed on the free list all india rubber, whatever its condition, imported as a material for manufacturing india-rubber articles; and it applied to old scrap and refuse rubber, whether imported after separation or as the content of, or associated with, other materials as a part of articles formerly useful.

---

3. Same—Doubt as to Construction, How Resolved.

The changed phraseology in the tariff act of 1909 relative to india rubber suggests a question at least in the mind of the Congress as to what is a proper construction of the similar clause in tariff act of 1897, but in the presence of doubt the importer should have the doubt resolved in his favor, and this importation was properly held by the board to be entitled to free entry under paragraph 579, tariff act of 1897.

United States Court of Customs Appeals, April 24,.1911.

Transferred from United States Circuit Court for Southern District of New York, Abstract 22658 (T. D. 30339).

[Affirmed.]

*D. Frank Lloyd*, Assistant Attorney General (*Charles D. Lawrence*, on the brief), for the United States.

*Coudert Bros.* (*Frederic R. Coudert* and *John P. Murray* of counsel) for appellee.

Before Montgomery, Smith, Barber, De Vries, and Martin, Judges.

De Vries, Judge, delivered the opinion of the court:

Appeal to the United States Circuit Court for the Southern District of New York duly transferred to this court.

The controversy is over the proper classification of so-called "reclaimed or recovered rubber." In some of the cases covered by this appeal the collector had classified the merchandise for duty under the provisions of paragraph 449 of the tariff act of 1897, as "manufactures of india rubber."

The material parts of that paragraph are:

449 Manufactures of bone, * * * india-rubber, * * * or of which these substances or either of them is the component material of chief value, not specially provided for in this act, thirty per centum ad valorem; * * * .

In the other cases the merchandise was classified for dutiable purposes under the provisions of section 6 of the act.

Sec. 6. * * * On all articles manufactured, in whole or in part, not provided for in this act, a duty of twenty per centum ad valorem.

It should be stated that the earlier classification by the Government was abandoned and the second adopted at the direction of the Secretary of the Treasury after a decision of the Board of General Appraisers, and that practice has continued.

The importer in each case claims that the merchandise is free of duty under paragraph 579 of the act, which reads:

579. India rubber, crude, and milk of, and old scrap or refuse India rubber which has been worn out by use and is fit only for remanufacture.

The claims of the importer are based upon the allegation that this merchandise is old scrap or refuse india rubber which has been worn out by use and is fit only for remanufacture.

At the hearing testimony was introduced by the Government and by the importer. It was sought by the Government to establish that crude india rubber applied only to that taken directly from the india-rubber tree or plant and put in condition necessary for the purposes

of transportation and marketing; that the term "scrap rubber" was one well known in trade and commerce and did not include this merchandise in the condition imported, but was the material from which the imported merchandise was manufactured.

It will be noted in passing that the language of the free list is "*scrap or refuse india rubber*," and that no attempt was made to assign to the term "refuse india rubber" any commercial signification.

The Government further made contention that the various processes through which the merchandise had admittedly gone rendered it a manufactured article; and, not being india rubber, crude, or milk thereof, or scrap india rubber, it therefore became dutiable as an unenumerated manufactured article.

The importer maintains that the processes applied to the article as imported were not manufacturing processes and did not constitute the product a manufacture; that the processes were simply, as indicated by the name of the article itself, the reclaiming or recovering of rubber from a condition of uselessness as such and cleaning and assembling it solely for the purposes of transportation and marketing; and that being rendered by these processes fit only for remanufacture, it was entitled to free entry under paragraph 579.

There are many different processes by which the article is recovered or reclaimed, but the method of application and results are substantially the same. They are what are known as the acid process, the alkali process, the mechanical process, and others.

There is no serious dispute as to the different operations of the process which have been applied to this merchandise as imported. As indicated by the testimony and the samples, they are substantially as follows:

The old scrap and refuse from which the rubber was recovered consists of old rubber boots, shoes, bicycle tires, automobile tires, garden hose, air-brake hose, heavy hose, etc. The stock is first carefully sorted; in the case of tires and similar articles the metal valves are cut away and the coarse metal removed by hand; the material is then chopped into small particles by machinery, again carefully sorted, and then fed by hand into the machine and by it chopped. This chopped material is baled and stored for the purposes of further operations. It goes from these bales into the grinding department, where it is thrown into chutes passing into what are called "crackers" and cracked up into small pieces; then again it is fed to other grinders and ground finer. At this stage it yet has the particles of fabric in it, and from there is passed into what are called "heaters," where it is treated by a chemical solution for the purpose of removing the particles of fabric. It is discharged from the heaters into what are called "washers," where the dirt, sand, and the particles of cloth and the chemical solution remaining are washed away. This operation

is of water alone. It is then "riffled," crimped up over long rifflers, which allow whatever additional particles of sand or metal that may remain to settle. A riffler is a long sheet built the length of the building, a trough several feet wide and possibly a couple of feet deep. From the riffler it goes into the settling tanks, where the water is drained off. It then goes into a machine where it is pressed out, and from there on to dry screens where the stock is artificially dried by heat at 220° F. blown through the stock by fans. It is then taken into the mills and sheeted; that is, comes out in a large slab. It is sometimes thereafter sent to the refiners, where it is sheeted into the commercial sheets, just as thin as can be made, for the purpose of crowding down and crushing the lumps.

This is the process as described by the makers of similar materials in this country. It appears from the record that the imported merchandise has not undergone the refining operation. Some of the witnesses describe the process as one of less detail of intermediate operations, but in our view of the case, from the character of the various operations described, this becomes unimportant.

This product is fit for manufacture for all purposes for which india rubber is usable. Sometimes it is used alone, but more frequently and usually with crude rubber. It is of but one-tenth to one-twelfth the value of crude rubber. Like crude rubber, it is fit for manufacture in some cases without any additional processes being applied to prepare the rubber for manufacture. When additional processes are applied they are different only in degree. The chief difference, as shown by the record, is that it is impossible to successfully devulcanize rubber, and consequently this imported article is to an extent vulcanized. So the particular use may control.

The first question for determination is whether or not this application of processes amounts to a manufacture. We think not.

They are all devoted to one end, as indicated by the name of the merchandise itself, "reclaimed or recovered rubber," to wit, the recovering of the rubber content from old worn-out goods into which it had been manufactured and of which it forms one of the component materials. The chopping of the old scrap or crude rubber, the segregation by hand therefrom of particles of iron, such as rivets, valves, etc., the grinding into smaller particles, the chemical treatment to which it is subsequently subjected, the bath which it undergoes immediately thereafter, the riffling and the blowing, are each and all devoted to the single and only purpose of separating the rubber from the other component materials of the scrap or refuse, and recovering or reclaiming it in a clean and pliable condition, eliminating therefrom all other parts of the scrap and adhering foreign matter.

The subsequent operations, even if we include the refining, which is not applied to the imported article, are applied not for the purpose

of putting the material on its course of manufacture toward some ultimate article into which it is to be subsequently made, but are solely and only for the purpose of recovering and assembling it, as all rubber is assembled, into a form suitable for transportation and marketing. It has not been entered to any degree upon its course as any certain manufactured article, but is a raw material suitable for use in the manufacture of innumerable articles. Nor is it a manufactured material, but rather "demanufactured," if the term may be used, and recovered and restored so far as can be to its original condition as a single material.

There are numerous authorities that these processes do not constitute a manufactured article, or a manufacture of a material.

Thus in Hartranft v. Wiegmann (121 U. S., 609), the Supreme Court said:

Washing and scouring wool does not make the resulting wool a manufacture of wool. Cleaning and ginning cotton does not make the resulting cotton a manufacture of cotton.

In Frazee v. Moffitt (20 Blatch., 267) the same court held that—

Hay pressed in bales, ready for market, was not a manufactured article, though labor had been bestowed in cutting and drying the grass and baling the hay.

In United States v. Wilson (1 Hunt's Merchants' Magazine, 167), cited with approval by the Supreme Court in Hartranft v. Wiegmann (121 U. S., 609), the court said that—

Marble which had been cut into blocks for the convenience of transportation was not manufactured marble, but was free from duty, as being unmanufactured.

In Littlejohn v. United States (119 Fed. Rep., 484) the similar principle was announced. The court said, it being contended that sago flour was not crude, because the pulp of the sago tree had been subjected to certain processes:

* * * The only manipulations which it undergoes in the foreign country are those which are necessary to fit it for importation, and consist in successive cleansing operations in order to get rid of the impurities which would otherwise cause fermentation.

* * * *In this case the processes of cleansing are essential to fit it for trade and commerce in this country; they neither refine nor manufacture it, but only serve to remove the impurities. Such processes are not sufficient to change its character from a crude product to a manufacture.*

In McKesson v. United States (113 Fed. Rep., 997) it was contended that crude sulphide of antimony was entitled to free entry as "antimony ore, crude sulphide of," as against the Government's contention that the merchandise was an unenumerated manufacture in whole or in part. It appeared that the merchandise was the product of a process by which the gangue or slag and rock were removed and only the ore was imported. The contention of the importer was sustained. That was essentially a recovering or reclaiming process such as this.

This court likewise has observed the same distinction. In United States v. Salomon Bros. (T. D. 31277; 1 Ct. Cust. Appls., 246) we held

that what are called linters, a short-fiber cotton taken from the cotton machine, boiled with a mixture of hot water and soda ash to loosen the dirt, and afterwards treated with chloride of lime, and then washed in pure water, left to dry, and put up in bales ready for shipment to this country, and sold principally for the manufacture of smokeless powder, was still cotton.

· Very elaborate processes by machinery, even though patented machinery, do not always constitute a manufacture. There are many well-known processes to which materials are subjected the result of which is not a manufacture. For example, the shells in the Wiegmann case were subjected to elaborate and possibly patented processes. The hay passed upon in the Frazee case was no doubt mowed by a patented machine, and raked by a second, and pressed and baled by a third. Nevertheless, the application of these processes did not constitute a manufacture in the judgment of the Supreme Court. So with ordinary laundry work. One's linen is treated with acid and machinery which is the subject of a patent, yet no one would contend that these processes resulted in a manufacture. In many, if not most, cases of modern work of this character the articles are subjected to hot-water baths containing alkalies, as is this material; they are whipped and run, as is this material; they are subjected to acids, as is this material, all for the same purpose of each process applied to this material, namely, for the purpose of cleaning the same; yet these processes so applied have never been held to constitute a manufacture. They have at Hull, England, what is known as the willowing process, which process acts in conjunction with others used for taking oil from the wool. They are all patented processes. They beat and whip out the dirt and extract the oils, as the processes applied to this old scrap extracts the cotton fibers and dirt. The products are subsequently pressed and baled, and yet no one would characterize this wool as imported a manufacture of wool or manufactured wool.

We are of the opinion that the processes devoted to this merchandise, as imported, did not constitute it a manufactured article in whole or in part.

The two paragraphs wherein the Congress appears to have endeavored with a few express exceptions to provide for india rubber are paragraphs 449 and 579 of the free list, quoted. We have not overlooked paragraph 450. It is instructive to compare the precise language of the two paragraphs. We think they evidence the purpose on the part of Congress to provide for india rubber in precise detail, commencing in its earliest obtainable conditions and concluding with its highest manufactured status. These provisions are for "manufactures of india rubber, wholly or in chief value," as provided in paragraph 449; and, "india rubber crude, milk thereof, and old scrap or refuse india rubber which has been worn out by use and is fit only for remanufacture."

The manifest purpose of Congress, in paragraph 579, was to put on the free list all india rubber, whatever its source or condition, which was imported to be used as a material in the manufacture of india-rubber articles. India rubber, crude, and milk of india rubber were well known and easily described. Old scrap or refuse india rubber, owing to the sources from which it was obtained and condition in which it was found, needed qualifications lest there be introduced free under that term otherwise dutiable articles. The actual thing made free by this provision seems to have been lost sight of. It is a provision enacted solely for the purpose of permitting free entry of india rubber as and when a manufacturing material. If we constantly bear this thought in mind, it seems to us many of the difficulties of construction will be avoided. The Congress having in mind rubber only, and that the source of much of this rubber in condition as found was old shoes, tires, hose, and other similar sources, which were apparently "articles" or "manufactures" dutiable under other specific provisions of the tariff law, confined its language in paragraph 579 so as to embrace only the rubber contained in these old articles. It is not old rubber shoes or old rubber tires or old rubber hose that are made free; but it is the old scrap or refuse rubber found in these things, and that there be no conflict between this provision and other provisions of the tariff law making these things, when articles or manufactures, dutiable, the Congress added the words "which has been worn out." In order to assign these words of the statute any voice whatever in the framework of its import, it is necessary that they should be construed as confining the paragraph to such sources of old scrap or refuse india rubber as had previously been "articles" or "manufactures," but which by virtue of being "worn out" ceased to be articles or manufactures of commerce within the meaning of the provisions of the tariff law. In other words, the force and effect of these words in the paragraph confines the "old scrap and india rubber" to the india-rubber material, which is found in combination with particles of iron or cotton and dirt adhering thereto, remnants of what were formerly articles or manufactures, but which by virtue of having been "worn out" by use have ceased to be such in the tariff sense and left the india rubber therein the valuable content.

This is precisely the view taken by the Supreme Court of the United States in approaching the question from another angle. In Cadwalader v. Jessup & Moore Paper Co. (149 U. S., 350) the Supreme Court said:

The uncontradicted testimony is to the effect that the only commercial use or value of the old india-rubber shoes, or scrap rubber, or rubber scrap in question, is by reason of the india rubber contained therein as a substitute for crude rubber; that the old shoes were of commercial use and value only by reason of the india rubber they contained, as a substitute for crude rubber, and not by reason of any preparation or manufacture which they had undergone; that they could not fairly be called "articles

composed of india rubber," and as such dutiable  *  *  *  ; and that, although the shoes may have been originally manufactured articles composed of india rubber, they had lost their commercial value as such articles, and substantially were merely the material called "crude rubber." They were not india-rubber fabrics, or india-rubber shoes, because they had lost substantially their commercial value as such.

The Congress by this provision had in mind that india rubber recovered from these old worn-out articles, and also that found and imported in the articles themselves, should be free—that is, this class of india rubber should be free without regard to its condition or environment if that were worthless.

This construction by the Supreme Court was of the provisions of the tariff act of 1890, paragraph 613, which is identical with paragraph 579 of the tariff act of 1897.

We think the paragraph plainly provides that old scrap and refuse india rubber shall be free, whether imported as the content of or associated with other materials, which formed a part of the article of its past usefulness; or, segregated therefrom, cleaned and put in shape for use as a material for manufacture.

In cases where the importation is the unreclaimed content of old articles, for example, old shoes, the phrase "which has been worn out by use" indicates the congressional intent by so limiting the scope of the free-entry paragraph that it excludes therefrom all such articles as have not, by means of use, lost their character as articles or manufactures in the tariff sense and become old scrap or refuse india rubber, valuable only for their india-rubber content.

If the india rubber of this source imported is not such a content, but recovered or reclaimed india rubber, as in this importation, then we think the words "and is fit only for remanufacture" were inserted for the purpose of and do prescribe a limitation upon the manipulations and conditions which may attend india rubber obtained from that source in order that it may be entitled to free entry, and beyond which it ceases to be so entitled.

The record shows that this limitation puts reclaimed rubber upon precisely the same basis as to condition as crude rubber, and assigns to the paragraph a uniform effect upon all india rubber imported as a manufacturing material.

This is the only possible office that can be assigned the phrase "and is fit only for remanufacture." Some effect must be given that phrase if possible.

Standing alone and without these words the other language of the statute, "old scrap or refuse india rubber," was sufficient to admit free of duty such when imported as a content of any old article worn out by use. But it might reasonably be held that the words "old scrap or refuse india rubber" would not include rubber material recovered from old scrap or refuse india-rubber articles, which by reason of that recovery has undergone several processes, acquired a

new name and greater value, unless it be held that the designation refers to that rubber which is produced from old scrap or refuse rubber, taking its name from its source.

The introduction of the phrase "and is fit only for remanufacture" into that paragraph, which assigned the import stated as its only effective office, renders that possible construction of the preceding words unimportant, for it expressly extends their natural scope to old scrap and refuse rubber in all conditions up to and including, but only including, that of being ready for manufacturing purposes.

That the language of paragraph 579 does include rubber from that source, imported as a content of the articles of its former use, was expressly decided by the Supreme Court. It was there contended that the merchandise thus imported was dutiable as articles of rubber, but the court held as quoted, *supra*, that being "worn out by use" they ceased to be "articles" or "manufactures" in a tariff sense and were free as "old scrap or refuse rubber" within this precise tariff language in the tariff act of 1890. Cadwalader *v.* Jessup & Moore Paper Co. (149 U. S., 350).

Unless the construction before noted is given the words "fit only for remanufacture" there would be a hiatus between the provisions of paragraph 579 and those of 449 in that scrap or refuse india rubber which had applied thereto well-known processes affecting the condition of this importation, but not having arrived at the condition of being a manufacture of india rubber were not provided for. If the purpose, therefore, of Congress of providing for all classes of this material from the lowest to the highest manufactured condition is to be given effect, the stated purpose of adding the words "fit only for remanufacture" and their intended effect becomes apparent.

We believe that it was the intention of Congress to include such merchandise as this importation within paragraph 579, and that in the view stated that purpose was accomplished by the language employed.

In any view it seems self-evident that the india-rubber *product*, whatever it may be termed in trade, of processes applied to old scrap or refuse india rubber, might well be included in the descriptive term "old scrap or refuse india rubber," deriving its description from its source of immediate production. In fact, we do not see how that conclusion can be seriously denied, and that being true, or even if only doubtful, the importer, appellant, is entitled to judgment upon the doctrine of doubt. It must be confessed that the character of the merchandise imported when considered in conjunction with the various provisions of law invoked is not entirely free from doubt. It might be better said that the proper interpretation of the language of paragraph 579 and its intended scope by Congress is not entirely free from doubt. The changed phraseology of the corresponding paragraph in the tariff act of August 5, 1909,

indicates at least a question in the mind of Congress as to the proper construction and import of the provision of the tariff act of 1897.

In the presence of doubt the importer is entitled to have the doubt resolved in his favor.

In Hartranft *v.* Wiegmann (121 U. S., 609) the Supreme Court said:

But, if the question were one of doubt, the doubt would be resolved in favor of the importer, "as duties are never imposed on the citizen upon vague or doubtful interpretations." Powers *v.* Barney (5 Blatch., 202); United States *v.* Isham (17 Wall., 496–504).

We are of the opinion that the decision of the Board of General Appraisers should be *affirmed.*

MONTGOMERY, Presiding Judge, and SMITH, BARBER, and MARTIN, Judges, concur.